UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENS ESSEMANN,<br><br>                    Plaintiff,<br><br>      v.<br><br>TELENAV, INC., HP JIN, DOUGLAS MILLER, SAMUEL CHEN, WES CUMMINS, and RANDY L. ORTIZ,<br><br>                    Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, Jens Essemann ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Telenav, Inc. ("Telenav" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Telenav, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger between the Company, V99, Inc. ("V99"), and Telenav99, Inc. ("Merger Sub"), a wholly-owned subsidiary of V99 ("Proposed Transaction"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2. On November 2, 2020, the Company entered into an agreement and plan of merger with V99 and Merger Sub ("Merger Agreement"), whereby Merger Sub will be merged with and into

1

Telenav, with Telenav surviving as a wholly-owned subsidiary of V99.

3. Upon consummation of the Proposed Transaction, each share of Telenav common stock will be converted into the right to receive $4.80 in cash ("Merger Consideration").

4. On December 18, 2020, in order to convince Telenav public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement ("Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's cash flow projections ("Cash Flow Projections"); (ii) the valuation analyses performed by the Company's financial advisor, B. Riley Securities, Inc. ("B. Riley"); and (iii) the potential conflicts of interest for B. Riley in connection with the Proposed Transaction.

6. The Proposed Transaction is expected to close in the first quarter of 2021, so the special meeting of Telenav shareholders to vote on the Proposed Transaction is imminent ("Shareholder Vote"). Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote, so Telenav's shareholders can properly exercise their corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Telenav shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of

the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Telenav's common stock trades on the NasdaqGS, which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Additionally, the Company's proxy solicitor, MacKenzie Partners, Inc. is located in this District at 105 Madison Avenue, New York, NY 10016.

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Telenav common stock.

12. Defendant Telenav is a public company incorporated under the laws of Delaware with principal executive offices located at 4655 Great America Parkway, Santa Clara, CA 95054. Telenav's common stock trades on the NasdaqGS under the ticker symbol "TNAV."

3

13. Defendant HP Jin is, and has been at all relevant times, a director of the Company, its Co-founder, its Chairman of the Board, its President, and its Chief Executive Officer. Defendant Jin is also the sole stockholder, sole director, and sole Chief Executive Officer of V99.

14. Defendant Douglas Miller is, and has been at all relevant times, a director of the Company and a member of the Special Committee authorized to evaluate and negotiate the Proposed Transaction.

15. Defendant Samuel Chen is, and has been at all relevant times, a director of the Company.

16. Defendant Wes Cummins is, and has been at all relevant times, a director of the Company and a member of the Special Committee authorized to evaluate and negotiate the Proposed Transaction.

17. Defendant Randy L. Ortiz is, and has been at all relevant times, a director of the Company and a member of the Special Committee authorized to evaluate and negotiate the Proposed Transaction.

18. The defendants identified in paragraphs 13 through 17 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company, V99, and the Proposed Transaction**

19. Telenav, together with its subsidiaries, provides connected car and location-based platform services in the United States and internationally. The Company operates through Automotive and Mobile Navigation segments. It offers automotive navigation services, including on-board solutions, which consist of software, map, and points of interest data loaded in vehicles that provide voice-guided turn by turn navigation displayed on the vehicle screen; and brought-in

navigation services. The Company also provides voice-guided, real-time, turn by turn, and mobile navigation services under various brand names, including Telenav GPS, as well as under wireless carrier brands. Its customers include wireless carriers, automobile manufacturers, original equipment manufacturers, advertisers, advertising agencies, and end users. Telenav distributes its services primarily through wireless carrier partners.

20. V99 was formed on September 30, 2020, for the purpose of engaging in the transactions contemplated by the Merger Agreement, and it has not engaged in any business activities other than in connection with the transactions contemplated by the Merger Agreement and arranging of the debt financing in connection with the Proposed Transaction.

21. According to the November 3, 2020, press release announcing the Proposed Transaction:

### Telenav Enters into Definitive Agreement to be Acquired by V99 in "Go Private" Transaction

SANTA CLARA, Calif. – November 3, 2020 – Telenav, Inc. (NASDAQ: TNAV), a leading provider of connected-car and location-based services, today announced that it has entered into a definitive merger agreement to be acquired by V99, Inc., a Delaware corporation led by HP Jin, Co-Founder, President, and Chief Executive Officer of Telenav, for $4.80 per share in an all cash transaction that values Telenav at approximately $241 million. HP Jin, Samuel T. Chen, a director of Telenav, and a certain entity affiliated with Mr. Chen, are expected to provide debt financing in connection with the proposed transaction.

The per share purchase price represents a premium of approximately 33.3 percent over Telenav's closing stock price on October 1, 2020, the last full trading day prior to announcing that the Special Committee had received a non-binding "go-private" proposal from V99. Upon completion of the transaction, Telenav will become a private company with the flexibility to continue investing in its connected-car strategy.

"We are pleased to have reached this agreement with V99, which we believe will deliver immediate value to stockholders and positions Telenav to accelerate its journey towards a connected-car future with smarter, easier and safer innovation," said Douglas Miller, Lead Independent Director and a member of the Telenav Special Committee. "The transaction is the result of a thoughtful and comprehensive review of value creation opportunities available to Telenav. We are confident that this transaction is in the best interest of Telenav and all of its

>stakeholders, and we look forward to working with HP and V99 to complete the transaction."
>
>"Today's announcement represents an exciting new chapter for Telenav," said HP Jin, Co-Founder, President and Chief Executive Officer. "As a private company, we will have the resources and flexibility to continue our growth and execute on our OEM-centric, connected-car strategy as the market for connected-car capabilities continues to expand. I would like to thank the Special Committee for taking the time to thoroughly evaluate and review V99's offer and Telenav's employees for their continued focus throughout this process. I am honored to continue leading Telenav through its next phase of growth and success, and I am confident Telenav will thrive as a privately held company."

(Emphasis in original).

22. The Merger Consideration represents inadequate compensation for Telenav shareholders. Proxy, 1, 44.

23. Therefore, it is imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for them to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Transaction.

**The Proxy Omits Material Information**

24. Defendants filed a materially incomplete and misleading Proxy with the SEC, despite the Individual Defendants being obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. Therefore, the Proxy should be amended prior to the Shareholder Vote, so the Company's shareholders can make an informed voting decision in connection with the Proposed Transaction.

25. First, the Proxy fails to disclose the Cash Flow Projections. It is indisputable that the Cash Flow Projections were the most important input in B. Riley's *Discounted Cash Flow Analysis* for Telenav because the analysis is based upon discounting the Cash Flow Projections to present value. Proxy, 55. However, Defendants elected to exclude the Cash Flow Projections from the Proxy,

6

despite the fact that they simultaneously elected to include a purported "summary" of B. Riley's *Discounted Cash Flow Analysis*. The omission of the Cash Flow Projections renders the projections on page 59 of the Proxy incomplete and misleading because without the Cash Flow Projections, the Company's shareholders will be misled as to the overall valuation picture of Telenav.

26.     The inclusion of Adjusted EBITDA projections while excluding Cash Flow Projections renders the Proxy incomplete and misleading because cash flow projections are widely recognized as the most important valuation metric when it comes to valuing a company and its stock. EBITDA projection metrics are not sufficient analogs for cash flow projections. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] There are fundamental differences between cash flow and EBITDA. EBITDA is not a sufficient alternative to cash flow—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy."[2] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understanding a company's value.[3] As a result of these material differences between EBITDA and cash flow, experts recognize cash flow as a much more accurate measure when it comes to analyzing the expected performance of a company.

---

[1]     Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2]     Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[3]     Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

27. In light of these significant differences between cash flow and EBITDA figures, Defendants must disclose the Cash Flow Projections, so the Company's shareholders can answer the following question in determining whether to vote in favor of the Proposed Transaction: Is the Merger Consideration fair compensation given the Cash Flow Projections?

28. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all of one's cards on the table face-up. In this case, only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the projections, but have omitted the Cash Flow Projections.

29. Second, the Proxy omits material information regarding B. Riley's financial analyses for the Proposed Transaction.

30. For B. Riley's *Selected Companies Analysis*, the Proxy omits the inputs and assumptions underlying application of a multiple range of 7.0x to 9.0x to Telenav's estimated fiscal year 2021E Adjusted EBITDA. Proxy, 53-54.

31. Similarly, in the *Selected Transactions Analysis*, the Proxy fails to disclose the inputs and assumptions underlying application of a multiple range of 6.0x to 8.0x to Telenav's LTM EBITDA for the period ended September 30, 2020. *Id.* at 54-55.

32. With respect to B. Riley's *Discounted Cash Flow Analysis* for the Company, the Proxy omits the following information: (i) the inputs and assumptions underlying B. Riley's selection of a

range of terminal value multiples of 5.5x to 6.5x to Telenav's estimated fiscal year 2025E Adjusted EBITDA; (ii) the inputs and assumptions underlying the selected discount rates ranging from 15.5% to 20.5% (taking into account Telenav's weighted average cost of capital); (iii) the inputs and assumptions underlying B. Riley's application of a range of terminal value multiples of 3.5x to 4.5x to Telenav's estimated fiscal year 2025E Adjusted EBITDA; and (iv) the inputs and assumptions underlying the discount rates ranging from 15.5% to 20.5%. *Id.* at 55.

33. These key inputs are material to the Company's shareholders, and their omission renders the summary of B. Riley's *Discounted Cash Flow Analysis* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.*

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, the Company's shareholders cannot evaluate for themselves the reliability of B. Riley's *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value ranges reflect the

true value of the Company or were the result of an unreasonable judgment by B. Riley, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

34. As for the *Premiums Paid Analysis*, the Proxy includes the median premiums paid to the target company's stockholders relative to the target company's single day closing share price for the date (i) one day prior to the announcement of the transaction, (ii) one week prior to the announcement of the transaction, and (iii) one month prior to the announcement of the transaction. Proxy, 55. However, the Proxy fails to disclose the low and high premiums paid, respectively.

35. Regarding B. Riley's *NOL Analysis* for Telenav, the Proxy omits the Company's NOLs, despite B. Riley utilizing this metric across all of its analyses performed in connection with the Proposed Transaction. *Id.* at 53-56. Further, the Proxy fails to disclose the inputs and assumptions underlying B. Riley's application of discount rates ranging from 16.5% to 19.5% (taking into account Telenav's weighted average cost of capital). *Id.* at 55-56.

36. Third, the Proxy fails to disclose information regarding potential conflicts of interest with B. Riley in connection with the Proposed Transaction, which renders the Proxy materially misleading.

37. To start, the Proxy mentions that B. Riley has rendered investment banking and other financial services to Telenav in the two years prior to the Proposed Transaction, receiving compensation as a result. Proxy, 56. Yet, the Proxy fails to disclose the specific services rendered and the amount of compensation received by B. Riley for each of the services provided.

38. Next, the Proxy fails to disclose whether B. Riley provided financial services to V99 in the two years prior to the Proposed Transaction. If B. Riley did in fact provide financial services to V99, the Proxy must disclose the services rendered and the compensation B. Riley received in connection with those services.

39. Finally, the Proxy provides that "B. Riley may become entitled to an additional fee in connection with solicitation of third party indications of interest in acquiring Telenav following the execution of the Merger Agreement," but the Proxy omits what the amount of this "additional fee" would be. *Id.*

40. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming Shareholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

41. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

42. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

43. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the

light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

44. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

45. Defendants have issued the Proxy with the intention of soliciting the Company's public common stockholders support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the Cash Flow Projections; (ii) the valuation analyses performed by B. Riley; and (iii) the potential conflicts of interest with B. Riley in connection with the Proposed Transaction.

46. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

47. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that B. Riley reviewed and discussed its financial analyses with the Individual Defendants, and further states that the Individual Defendants considered

the financial analyses provided by B. Riley, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review B. Riley's analyses in connection with their receipt of the fairness opinions, question B. Riley as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

48. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

49. Telenav is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

50. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the

exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

51. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52. The Individual Defendants acted as controlling persons of Telenav within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Telenav, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

53. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

54. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

55. In addition, as the Proxy sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

58. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT III**

**(Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)**

59. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

61. As alleged herein, the Individual Defendants breached their duty of candor/disclosure

by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

62. The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

63. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

| | |
|---|---|
| Dated: January 6, 2021 | **MONTEVERDE & ASSOCIATES PC** |
| | |
| | */s/* Juan E. Monteverde |
| | Juan E. Monteverde (JM-8169) |
| | The Empire State Building |
| | 350 Fifth Avenue, Suite 4405 |
| | New York, NY 10118 |
| | Tel: (212) 971-1341 |
| | Fax: (212) 202-7880 |
| | Email: jmonteverde@monteverdelaw.com |
| | |
| | *Attorneys for Plaintiff* |